## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LEONARDO PEREZ,

       Plaintiff,

vs.                                 No. CIV 11-0852 JB/LFG

QWEST CORPORATION
and RICK MAGGINE,[1]

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Petition to Compel Arbitration and Award Attorneys' Fees or to Dismiss Jury Demand and Demand for Punitive Damages, filed January 31, 2012 (Doc. 18)("Motion"). The Court held a hearing on April 5, 2012. The primary issues are: (i) whether the parties have agreed to have an arbitrator decide the issue whether the dispute is arbitrable; (ii) whether the parties' arbitration agreement covers the claims Plaintiff Leonardo Perez has asserted against Defendants Qwest Corporation and Rick Maggine; and (iii) whether the Court should award costs and attorney's fees to the Defendants for the expenses they have incurred in bringing the Motion. The Court will grant the Motion. Because there is not a clear and unmistakable agreement to have an arbitrator decide whether the dispute is arbitrable, the arbitration agreement does not provide for an arbitrator to decide whether the case is arbitrable. Because Perez' claims do not conflict with, or face complete preemption under, section 301 of the Labor Management Relations Act, 29 U.S.C. §§ 141-87 ("LMRA"), and are otherwise covered

---

[1]On February 8, 2012, the Court entered an Order granting the parties' joint motion to amend the caption of this case and to change all references to Qwest Communications Co., LLC to Qwest Corporation. See Order at 1.

under the parties' arbitration agreement, the Court will compel Perez to arbitrate his claims against the Defendants.  Because the parties contractually agreed to an award of costs and attorney's fees if either party successfully compels arbitration, the Court will award the Defendants their costs and attorney's fees incurred in bringing this Motion.

## FACTUAL BACKGROUND

The Court recites the allegations in this section in the light most favorable to Perez.  Perez initially began working for U.S. West, Inc., Qwest' predecessor.  The arbitration agreement to which Perez agreed when he became employed with U.S. West in 2000 provides:

> Any claim, controversy or dispute between you and U S WEST, unless otherwise covered by a collective bargaining agreement, whether sounding in contract, statute, tort, fraud, misrepresentation, discrimination or any other legal theory, including, but not limited to, disputes relating to the interpretation of this Attachment; claims under Title VII of the Civil Rights Act of 1964, as amended; claims under the Civil Rights Act of 1992; claims under the Age Discrimination in Employment Act of 1967, as amended; claims under 42 U.S.C. § 1981, § 1981a, § 1983, § 1985, or § 1988; claims under the Family Medical Leave Act of 1993; claims under the Americans with Disabilities Act of 1990, as amended; and, claims under the Fair Labor Standards Act of 1938, as amended, whenever brought shall be resolved by arbitration.  The only legal claims between you and U S West which are not included within this Agreement for Arbitration are claims by you for workers' compensation or unemployment compensation benefits and/or claims for benefits under a U S WEST benefit plan if the plan does not provide for arbitration of such disputes.  You hereby waive and release all rights to recover punitive or exemplary damages in connection with any common law claims, including claims arising in Tort or contract against U S WEST.  <u>By signing this Attachment, you voluntarily, knowingly and intelligently waive any right you may otherwise have to seek remedies in court or other forums, including the right to a jury trial and the right to seek punitive damages on common law claims.</u>  The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA") shall govern the arbitrability of all claims, provided that they are enforceable under the Federal Arbitration Act, as it may be amended from time to time.  In the event the FAA does not govern, the Colorado Uniform Arbitration Act shall apply.  Additionally, the substantive law of Colorado, only to the extent it is consistent with the terms stated in this Agreement for Arbitration, shall apply to any common law claims.

Attachment A at 4 (dated June 22, 2000), filed January 31, 2012 (Doc. 18-1)("Arbitration

Agreement")(emphasis in original).

Perez was also subject to a collective bargaining agreement as an employee in the Communications Workers of America ("CWA") union, which signed a collective bargaining agreement with Qwest. Agreement Between Qwest Communications and Communications Workers of America at 2 (dated October 12, 2008), filed February 16, 2012 (Doc. 23-1)("CBA"). Article 12 of the CBA provides that "[a]n employee whose Term of Employment (TOE) is one (1) or more years shall receive wage replacement during the first seven (7) consecutive calendar days of absence due to sickness" according to a formula table that the CBA specifies. CBA at 8. Article 16.3 of the CBA provides: "Neither the Company or its representative, nor the Union, its local representative or members, will attempt, by means other than the grievance procedure, to bring about the settlement of any issue which is properly a subject for disposition through grievance or arbitration procedures." CBA at 11. The relevant provisions of article 23 of the CBA are as follows:

> An employee who is unable to perform the functions determined as essential by the Company of his or her regular job as a result of an on-the-job accidental injury (as defined in the West Disability Plan) or an illness, physical or mental limitation, or off-the-job injury, will be considered for a position of equal or lower status and pay.
>
> . . . .
>
> . . . If Qwest Disability Services or its designee has determined the employee can return to work with a medical restriction of one hundred eighty (180) calendar days or less, the employees shall remain in the present job title and receive the present paid rate for up to ninety (90) calendar days. If after ninety (90) calendar days the employee is still unable to perform the essential functions of his or her regular job, the employee shall remain in the present job title and the remaining ninety (90) calendar days shall be treated as non-paid excused time. A maximum of one hundred eighty (180) calendar days (paid/unpaid) will be allowed in a rolling twelve (12) month period regardless of the number or nature of the employee's restrictions.
>
> The Company or Union Bargaining Agents may initiate a review based on extenuating circumstances, to discuss any exceptions of the (180) calendar days prior to placement of an employee on an eighty (80) day job search as outlined in Section 23.6. Any such agreement between the parties' Bargaining Agents shall be

considered non-precedential and non-referable.

CBA at 13.  The remaining relevant portions of article 23 are as follows:

> To assist in determining the abilities of an employee with medical restrictions, an assessment may be conducted at the request of the employee or the local union (if the employee concurs) or at the initiation of the Company.  The employee must participate in this evaluation.  The assessment tool, which may include but not be limited to, a Functional Capacity Evaluation, Independent Medical Evaluation, and/or Cognitive Testing, will be determined by Qwest Disability Services or its designee based on the employee's condition and diagnosis.  This assessment will determine the employee's ability to remain in his/her current job or another job within the Company with or without accommodation.  Utilization of the assessment tool will not alter the job search process as outlined in Article 23.6

> . . . .

> . . . Following is the position to be taken regarding the option of obtaining an Independent Medical Evaluation (IME).  A demotion or termination handled under the provisions of Article 16 which results from the imposition of a medical restriction, shall not be subject to arbitration.  If a dispute arises concerning either the length or the scope of the medical restriction, and the employee so requests or the local union requests (if the employee concurs), Qwest Disability Services or its designee will consult with the employee's personal physician concerning the length and scope of the restriction.  If they are unable to agree, the matter will be referred to a mutually acceptable physician (in accordance with the administrative guidelines in place regarding this process) who is knowledgeable in occupational safety and health matters who shall be afforded the opportunity to review the pertinent medical data, to review the requirements of the work place, and to examine the employee.  An agreement with the independent physician will ensure that the results of the examinations will be received by the Company and the Union within fifteen (15) calendar days of the examination.  Both the Company and the Union will comply with the decision of this physician as to the proper length and scope of the restriction.

CBA at 13.

"Qwest first hired Perez in 1999."  Complaint for Damages from Violations of Title VII of the Civil Rights Act and Assault and Battery ¶ 11, at 2, filed September 23, 2011 (Doc. 1)("Complaint").  "In 2002, Qwest transferred Perez to Las Cruces, New Mexico."  Complaint ¶ 11, at 2.  "Following the transfer, Perez worked as a splicer network technician."  Complaint ¶ 11, at 2.  "Perez has remained in this position until the present date."  Complaint ¶ 11, at 2.  "Perez has

fulfilled his job duties in at least a satisfactory manner throughout the period of the Las Cruces employment and became known as one of the most capable Qwest employees in Las Cruces in his position."  Complaint ¶ 11, at 2.  "Qwest consistently emphasizes with its employees the need to work in a safe and secure manner."  Complaint ¶ 12, at 2.

"In 2007, Maggine became Perez' supervisor."  Complaint ¶ 13, at 2.   "At some point in 2008, Perez learned that Maggine was altering and falsifying employee time sheets, including those of Perez."  Complaint ¶ 14, at 3.  "The falsification of employee time sheets is, in accordance with Qwest policies and procedures, a serious violation of Qwest work requirements and rules."  Complaint ¶ 14, at 3.  "Maggine consistently instructed Perez that Maggine would take care of filling out Perez' time sheets -- a duty the individual employee was expected to perform."  Complaint ¶ 16, at 3.  "Maggine would take the extra hours allotted to jobs Perez was required to complete and distribute those hours among 'favored' employees under Maggine's supervision who were not completing jobs in a timely manner."  Complaint ¶ 16, at 3.  "When Perez confronted Maggine about the inappropriateness of allotting hours in this fashion, Maggine became upset and agitated and told Perez to be quiet about Maggine's improper activities."  Complaint ¶ 17, at 3.  "In 2009, Perez called a Qwest hotline to disclose Maggine's improper behavior related to falsification of Perez' time sheets."  Complaint ¶ 19, at 3.  "Maggine learned that Perez had made this supposedly confidential disclosure."  Complaint ¶ 19, at 3.  Maggine then began making a variety of racially derogatory comments to Perez and "started giving Perez the worst jobs to complete."  Complaint ¶ 20, at 3-4.  "This practice of giving Perez the worst jobs continued until Perez went out on medical leave in June 2011."  Complaint ¶ 20, at 4.

"In 2010, Perez suffered an injury to his back while on a Qwest duty assignment."  Complaint ¶ 22, at 4.  "The injury resulted in a ruptured disk in Perez' lower back."  Complaint ¶ 22,

at 4.  "When Maggine learned of Perez' injury, he called Perez and angrily stated that he was considering terminating Perez."  Complaint ¶ 22, at 4.  "Maggine continued to harass and intimidate Perez. Maggine threatened Perez by shutting a laptop computer in Perez' face."  Complaint ¶ 27, at 5.  "Maggine also physically threatened Perez by leaning into him forcefully in the workplace."  Complaint ¶ 27, at 5.  "Shortly afterwards, on May 27, 2011, Maggine drove his company vehicle towards Perez at a Las Cruces gas station."  Complaint ¶ 28, at 5.  "Maggine drove the vehicle directly at Perez and swerved at the last moment, barely avoiding hitting Perez."  Complaint ¶ 28, at 5.  "Maggine confronted Perez at the gas station and screamed at Perez."  Complaint ¶ 28, at 5.  "Perez, afraid for his safety, then called Qwest corporate security and reported the assault Maggine inflicted on Perez."  Complaint ¶ 28, at 5.

"On May 31, 2011, Maggine . . . approached Perez while Perez was seated at a work computer."  Complaint ¶ 30, at 5.  "Maggine forcefully leaned into Perez, handed Perez papers that Maggine told Perez to sign, and then left."  Complaint ¶ 30, at 5.  "The papers represented an unjustified disciplinary action Maggine had written up."  Complaint ¶ 30, at 5.  "When Maggine exited Perez' proximity, Perez, again fearful for his safety, left the area and went to his truck."  Complaint ¶ 30, at 5.  "Maggine followed Perez and began chasing Perez as Perez entered the truck. Maggine was shouting at Perez and pulling at the door of the truck."  Complaint ¶ 30, at 5.  "Perez rightly feared that Maggine was beside himself and feared that Maggine would attack him."  Complaint ¶ 30, at 5.  "Maggine banged on the windows of the vehicle and repeatedly attempted to forcefully enter the truck."  Complaint ¶ 30, at 5.  "Perez told Maggine to get away from the vehicle but Maggine refused. Perez then called the police to report the situation."  Complaint ¶ 31, at 5.  "The police came and the situation was eventually defused."  Complaint ¶ 31, at 5-6.  "Qwest management then demanded that Perez hand in his work badge and truck keys and ordered him off

the property." Complaint ¶ 31, at 6. Perez eventually "began to suffer from heart palpitations, depression, and anxiety," as well as "panic attacks." Complaint ¶ 36, at 7.

### PROCEDURAL BACKGROUND

On September 23, 2011, Perez filed his Complaint. See Doc. 1. Perez asserts the following Counts against Qwest: (i) Count I - Violation of Title VII: National Origin Discrimination; (ii) Count II - Violation of Title VII: Hostile Work Environment; (iii) Count III - Violations of Title VII: Constructive Discharge; and (iv) Violation of Title VII: Retaliation. See Complaint at 7-11. Perez asserts the following claim against Maggine: Count V - Assault and Battery. See Complaint at 11-12.

The Defendants relate that they communicated with Perez' counsel and informed him that they intended to compel arbitration for this dispute if Perez did not concur. See Motion at 3. On January 31, 2012, the Defendants filed their Motion seeking to compel arbitration. See Doc. 18. The Defendants assert that, as part of his employment, Perez agreed to sign an arbitration agreement that covers the claims he has brought in this case. See Motion at 1-2. The Defendants assert that "the FAA controls in this matter, but under either" federal arbitration law or Colorado arbitration law, "Plaintiff should be required to arbitrate his claims." Motion at 4. The Defendants contend that there is a strong policy favoring arbitration under both federal and Colorado law. See Motion at 4. The Defendants assert that the Arbitration Agreement is conspicuous and unambiguous, such that Perez cannot claim it is unenforceable. See Motion at 5. The Defendants argue that, "[u]nder the terms of the Arbitration Agreement, the agreement controls discrimination claims, common law torts and any dispute between these parties regarding 'interpretation of this Attachment.'" Motion at 5. The Defendants contend that the Arbitration Agreement makes "the question of arbitration itself subject to arbitration," and asserts that "once this Court determines that a valid agreement to

arbitrate exists, the arbitrator is vested with jurisdiction over any questions regarding the satisfaction of conditions precedent and/or enforceability of the arbitration provision."  Motion at 5.  The Defendants argue that they have raised the arbitration issue in a timely manner without participating in any significant way in this federal litigation.  See Motion at 6.  The Defendants assert that Perez has waived his right to both have a jury trial and to seek punitive damages.  See Motion at 7.  The Defendants also seek their costs and attorney's fees incurred through filing this Motion.  See Motion at 7.

On February 16, 2012, Perez filed his Plaintiff's Response to Defendants' Petition to Compel Arbitration and Award Attorney's Fees or to Dismiss Jury Demand and Demand for Punitive Damages.  See Doc. 23 ("Response").  Perez contends that the "Defendants' petition must fail as the Agreement for Arbitration upon which Defendants rely specifically exempts Perez' claims in this action from its terms and conditions."  Response at 1.  He argues that the Arbitration Agreement "does not correspond to claims which are subsumed or 'covered' under the provisions of a collective bargaining agreement (CBA)."  Response at 1.  Perez argues that "all the factual and legal claims set forth in the original complaint are 'covered' by the CBA."  Response at 1.  Perez concedes that he signed the Arbitration Agreement and that Qwest is a successor to U.S. West.  See Response at 2-3.  Perez relates that, "[d]uring the entire period of his employment with Defendant Qwest[,] Perez was a member of the Communication Workers of America, a duly organized and authorized union representing Perez."  Response at 3.  Perez states that, "[a]s a member of the CWA, [he] filed a number of grievances related to the facts and circumstances supporting the claims Perez makes in the instant case."  Response at 3.  He notes that the "CBA includes a non-discrimination provision that expressly prohibits unlawful discrimination against any employee."  Response at 3.  He asserts that the "CBA also addresses work hours, schedules, and overtime," and that he "grounded a number

of his claims in this action to discriminatory conduct related to work hours, schedules, and overtime." Response at 4. He asserts that the "CBA further contains a number of provisions related to injured/ill employees," and notes that the "Complaint sets forth a number of allegations related to Perez' health, medical condition, and well-being, including threats from Defendant Maggine." Response at 4.

Perez argues that "[e]ach and every one of the factual allegations found in Section II of the Complaint have some corollary to a CBA provision." Response at 4. Perez relates that he recognizes that he will need to amend his Complaint to state a claim against Qwest. See Response at 5-6. He notes that he "is now in the process of finalizing an amended complaint which will include claims against the CWA for breach of a duty of fair representation." Response at 5-6. He notes that, "[a]t that point, this action will become a hybrid § 301 action under the Labor Management Relations Act." Response at 6. He relates that "these circumstances are not fatal to Perez's recovery on his discrimination and common law claims against Defendants and, furthermore, have no bearing on the issue of arbitrability before the Court." Response at 6. He argues that he has not waived his right to a jury trial or to punitive damages, because his claims are not subject to arbitration. See Response at 6-7. Perez also requests "his attorney's fees and costs." Response at 7.

On March 5, 2012, the Defendants filed their Defendants' Reply in Support of Petition to Compel Arbitration and Award Attorneys' Fees or to Dismiss Jury Demand and Demand for Punitive Damages. See Doc. 24 ("Reply"). The Defendants assert that Perez "is incorrect that the issue of 'arbitrability' is before the Court," because the parties have agreed to "give the arbitrator jurisdiction to decide the question of arbitrability." Reply at 1-2. They argue that "the only issue before the Court is whether the Arbitration Agreement is an enforceable contract, which issue

Plaintiff does not dispute."  Reply at 1-2.  The Defendants assert that, "[t]o the extent the Court will consider Plaintiff's argument" that "the language 'unless otherwise covered by a collective bargaining agreement' excludes his claim from mandatory arbitration," Perez' "interpretation not only contradicts the plain language of the Agreement but also belies common sense."  Reply at 3. They argue that, "[i]f Plaintiff's reading of this language was adopted, all claims between an employee and the Company would be subject to the grievance and labor arbitration process, which would be an absurd and incorrect result."  Reply at 3.  They also contend that the "Plaintiff's claims cannot be 'covered by' the CBA," because "[c]laims concerning the terms of a CBA can only be pursued in an action under § 301 of the Labor Management Relations Act."  Reply at 3-4.  They assert that the "Supreme Court has determined that" section 301's "language completely preempts claims that seek to interpret the terms of collective bargaining agreements under state law."  Reply at 4.  They relate that section 301 "does not preempt claims under other federal statutes, such as Title VII, but a claim under Title VII is, by definition, not a claim 'covered' by the CBA."  Reply at 4 n.3 (citing Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 737-38 (1981)).  They argue that Perez cannot state a claim under section 301, because "he would have had to exhaust his administrative remedies and file within the six-month statute of limitations for such claims."  Reply at 5.  They note that Perez has not alleged that he has done so.  See Reply at 6.  They also argue that, "[e]ven if Plaintiff did exhaust his administrative remedies, consideration of any LMRA claim that occurred more than six months prior to his filing this suit would still be barred by the statute of limitations."  Reply at 6.  They contend that the "Plaintiff's demand for attorneys' fees is at odds with his admission that his Complaint, as pleaded, is subject to arbitration."  Reply at 7.  They relate that Perez "has failed to provide even a draft amended complaint that purports to put forward a claim not subject to arbitration, as he states he will do."  Reply at 7.

At the hearing on April 5, 2012, the Defendants asserted that there is no dispute that the Arbitration Agreement is binding, but only a dispute whether the Arbitration Agreement covers the claims Perez has brought. See Transcript of Hearing at 3:3-11 (taken April 5, 2012)(Lyons)("Tr.").[2] The Defendants emphasized that an arbitrator should decide the threshold question of arbitrability. See Tr. at 3:19-4:10 (Lyons). The Defendants asserted that the only limitation on parties' ability to agree to have an arbitrator decide arbitrability are that the agreement must be clear and unmistakable. See Tr. at 3:25-4:10 (Lyons). The Defendants acknowledged that the Arbitration Agreement excludes disputes that the CBA covers, but disputed that the CBA covers Perez' claims. See Tr. at 4:11-22 (Lyons). Perez related that, at the time he filed this suit, he was unaware of the existence of the Arbitration Agreement. See Tr. at 6:14-25 (Mozes). He noted that he signed the Arbitration Agreement approximately twelve years ago. See Tr. at 6:14-25 (Mozes). He asserted that the Defendants have not pled as an affirmative defense in their answer that the dispute is subject to arbitration such that the Court should not award attorney's fees against Perez. See Tr. at 6:25-7:6 (Mozes). Perez stated that the Arbitration Agreement does not provide that the question of arbitrability is one for an arbitrator. See Tr. at 7:13-20 (Mozes). He asserted that courts are the ones who generally determine arbitrability. See Tr. at 7:21-8:9 (Mozes). He stated that the appropriate course of action would be for the Court to permit him to amend his Complaint to bring a section 301 claim against the CWA. See Tr. at 10:18-21 (Mozes). The Court asked whether it had authority not to award attorney's fees, in light of the parties' agreement regarding those fees, if it grants the Motion seeking to compel arbitration. See Tr. at 11:2-6 (Court). Perez argued that it would be inequitable to assess attorney's fees. See Tr. at 11:7-17 (Mozes). The Defendants stated that, if

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Perez wants to file an Amended Complaint asserting a section 301 claim against the CWA and Qwest, he may do so if he can meet the requirements to maintain a claim under section 301.  See Tr. at 12:20-13:4 (Lyons).  The Defendants asserted that this issue is not before the Court and that the Court should decide the Motion based on the claims Perez has filed.  See Tr. at 12:20-13:4 (Lyons).  The Defendants argued that, if Perez plans to seek amendment, he should have sought amendment before now.  See Tr. at 13:21-14:2 (Lyons).  The Court stated that it was inclined to send the case to arbitration and to award attorney's fees to the Defendants.  See Tr. at 14:18-15:1 (Court).

**LAW REGARDING ARBITRATION AGREEMENTS AND THE
FEDERAL ARBITRATION ACT**

The Federal Arbitration Act, 9 U.S.C. §§ 1 through 16 ("FAA"), governs the enforcement of arbitration clauses in commerce and maritime contracts.  Section 2 of Title 9 of the United States Code provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."  Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. 2772, 2776 (2010)(citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006); Volt Info. Sci., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)).  "Like other contracts, however, they may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"  Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2776 (citing Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).  Accord

-12-

AT&T Mobility LLC v. Concepcion, 131 S.Ct. 1740, 1746 (2011).  In Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 (1967), the Supreme Court of the United States held that, once a court determines that a claim is subject to arbitration, the court is without authority to address the merits of the claim.  See 388 U.S. at 400 ("Section 3 requires a federal court in which suit has been brought 'upon any issue referable to arbitration under an agreement in writing for such arbitration' to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement.").  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate."  Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).

Under FAA section 4, a party "aggrieved" by the failure of another party "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  If a party is aggrieved by the refusal of another to arbitrate under a written agreement, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4. Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before

ordering compliance with that agreement under § 4." Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2774.

1.      **Strong Federal Policy Favoring Arbitration.**

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994). See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Ams. Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'")(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24). Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision. See Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. at 474 (stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts."). When the applicability of arbitration is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25).

2.      **Agreements to Arbitrate Arbitrability.**

"[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777. The Supreme Court has explained that this rule "merely reflects the principle that arbitration is a matter of contract." Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777. The Supreme Court has described the term arbitrability as "whether the

-14-

parties agreed to arbitrate [a] dispute." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942 (1995)(Breyer, J.). Accord AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)(describing arbitrability as "whether" an "agreement creates a duty for the parties to arbitrate the particular grievance"). The Supreme Court has clarified that the validity of a contract as a whole is not a question of arbitrability, including when there is a larger arbitration agreement and a more specific agreement to arbitrate issues of arbitrability. See Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777-78 ("Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."); Quilloin v. Tenet HealthSystem Phila., Inc., 673 F.3d 221, 229 (3d Cir. 2012)("To eliminate the confusion caused by an agreement to arbitrate nested within another agreement to arbitrate, the Rent-A-Center Court found it necessary to distinguish between the overall arbitration agreement (the 'contract'), and the agreement to arbitrate arbitrability (the 'delegation clause')."). As the Supreme Court has discussed:

> The Agreement here contains multiple "written provision[s]" to "settle by arbitration a controversy." Two are relevant to our discussion. First, the section titled "Claims Covered By The Agreement" provides for arbitration of all "past, present or future" disputes arising out of Jackson's employment with Rent-A-Center. Second, the section titled "Arbitration Procedures" provides that "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." The current "controversy" between the parties is whether the Agreement is unconscionable. It is the second provision, which delegates resolution of that controversy to the arbitrator, that Rent-A-Center seeks to enforce. Adopting the terminology used by the parties, we will refer to it as the delegation provision.

> The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement. We have recognized that parties can agree to arbitrate "gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. This line of cases merely reflects the principle that arbitration is a matter of contract. An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement

-15-

the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.  The additional agreement is valid under § 2 "save upon such grounds as exist at law or in equity for the revocation of any contract," and federal courts can enforce the agreement by staying federal litigation under § 3 and compelling arbitration under § 4.  The question before us, then, is whether the delegation provision is valid under § 2.

Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777-78.  When an agreement to arbitrate arbitrability appears in the larger arbitration clause, there is no delegation clause that would require a court to distinguish between multiple agreements to arbitrate.  See Quilloin v. Tenet HealthSystem Phila., Inc., 673 F.3d at 229-30 ("There was no need to distinguish between multiple agreements to arbitrate; all that Quilloin needed to do was challenge the validity of the only agreement to arbitrate.").   A district court must resolve the question of arbitrability before submitting a dispute to arbitration.  See Oil, Chem. & Atomic Workers Int'l Union (AFL-CIO) v. Conoco, Inc., 241 F.3d 1299, 1305 (10th Cir. 2001)("The possibility that the district court might revisit the arbitrability question at the conclusion of the arbitration proceedings is not an adequate substitute for a pre-arbitration ruling."); Parrish v. Valero Retail Holdings, Inc., 727 F.Supp.2d 1266, 1273 (D.N.M. 2010)(Browning, J.)("In the Tenth Circuit, and in the courts of New Mexico, the 'existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked.'" (quoting Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997)).

The Supreme Court has held that "courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777 (alterations in original).  In other words:

> In this manner the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because  it is within the scope of a valid arbitration agreement" -- for in respect to this latter question the law reverses the presumption.

-16-

First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 626).  The Tenth Circuit has stated that, "[o]f course, the most 'clear and unmistakable' agreement to arbitrate the issue of arbitrability would be an express statement to that effect in the parties' contractual agreement to arbitrate disputes arising between them."  Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 968 (10th Cir. 2001), rev'd 537 U.S. 79 (2002).  The Tenth Circuit has held that the phrase in an "arbitration clause" that referred to the arbitrator handling "any and all disputes arising out of or relating to the contract" was not clear and unmistakable, because "there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit to an arbitrator the question whether an agreement to arbitrate exists."  Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 780 (10th Cir. 1998).

The United States Court of Appeals for the Eighth Circuit found the following language to be clear and unmistakable regarding arbitrability: "Any controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s)."  Sadler v. Green Tree Servicing, LLC, 466 F.3d 623, 624 (8th Cir. 2006).  The United States Court of Appeals for the Ninth Circuit found the following language to be clear and unmistakable regarding arbitrability:

> If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement or the validity or application of any of the provisions of this Section 4, and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding arbitration.

Momot v. Mastro, 652 F.3d 982, 988 (9th Cir. 2011)(emphasis in original).

The United States Court of Appeals for the Second Circuit rejected a party's argument that "a general arbitration clause covering all issues of interpretation would no longer be regarded as sufficiently clear and unmistakable, absent precise language that issues of arbitrability should be

arbitrated," stating that it did "not read" the Supreme Court's decision in "First Options so expansively." Abram Landau Real Estate v. Bevona, 123 F.3d 69, 73 (2d Cir. 1997).  In that case, the Second Circuit was interpreting a provision that stated that "[a] Contract Arbitrator shall have the power to decide all differences arising between the parties to this agreement as to interpretation, application or performance of any part of this agreement." Abram Landau Real Estate v. Bevona, 123 F.3d at 73.  The United States Court of Appeals for the Fourth Circuit has held that "an arbitration clause committ[ing] all interpretive disputes relating to or arising out of the agreement does not satisfy the clear and unmistakable test." Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 102 (4th Cir. 2012)(alteration in original).  The United States Court of Appeals for the Seventh Circuit concluded that the following language was not clear and unmistakable, specifically a provision requiring arbitration of "all differences arising out of the interpretation or application of any provision of [the] agreement." Local 744, Int'l Broth. of Teamsters v. Hinckley & Schmitt, Inc., 76 F.3d 162, 163-65 (7th Cir. 1996)(alteration in original). In an unpublished opinion, the United States Court of Appeals for the Sixth Circuit concluded that the following language was not clear and unmistakable: "[T]he arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code which interpretation shall be final and binding upon the parties." Sec. Serv. Network, Inc. v. Cromwell, 62 F.3d 1418, 1995 WL 456374, at *3 (6th Cir. 1995)(unpublished table decision).

## LAW REGARDING LMRA PREEMPTION

In Caterpillar Inc. v. Williams, 482 U.S. 386 (1987), the Supreme Court articulated the doctrine of complete preemption:

> On occasion, the Court has concluded that the pre-emptive force of a statute is so "extraordinary" that it "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."

> Metropolitan Life Ins. Co. [v. Taylor, 481 U.S. 58, 65 (1987)].  Once an area of state
> law has been completely pre-empted, any claim purportedly based on that
> pre-empted state law is considered, from its inception, a federal claim, and therefore
> arises under federal law.  See Franchise Tax Bd. [of State of Cal. v. Construction
> Laborers Vacation Trust for S. Cal., 463 U.S. 1, 24 (1983)]("If a federal cause of
> action completely pre-empts a state cause of action any complaint that comes within
> the scope of the federal cause of action necessarily 'arises under' federal law").

482 U.S. at 393.  The Supreme Court has held that section 301 of the LMRA has complete

preemptive force.  See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S.

Cal., 463 U.S. at 23.  "Section 301 of the LMRA governs claims founded directly on rights created

by collective-bargaining agreements, and also claims substantially dependent on analysis of a

collective-bargaining agreement, although it does not contain an explicit preemption provision."

Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1163-64 (10th Cir. 2004)(footnote omitted)(citation

omitted)(internal quotation marks omitted).

### 1.    General Preemption Principles Under the LMRA.

Section 301 of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization
> representing employees in an industry affecting commerce as defined in this chapter,
> or between any such labor organizations, may be brought in any district court of the
> United States having jurisdiction of the parties, without respect to the amount in
> controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  The Tenth Circuit has explained that section 301 "preempts questions relating

to what the parties to a labor agreement agreed, and what legal consequences were intended to flow

from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach

of contract or in a suit alleging liability in tort."  Cisneros v. ABC Rail Corp., 217 F.3d 1299, 1302

(10th Cir. 2000)(citations omitted)(internal quotation marks omitted).  Accord Carroll v. City of

Albuquerque, 749 F.Supp.2d 1216, 1223-24 (D.N.M. 2010)(Browning, J.).

In Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985), the Supreme Court set forth the standard for determining when section 301 completely preempts a state law claim: "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." 471 U.S. at 220 (citation omitted).  In Allis-Chalmers Corp. v. Lueck, the plaintiff brought a state tort claim against his employer for the bad-faith processing of an insurance claim.  See 471 U.S. at 206.  The Supreme Court concluded that section 301 completely preempted the cause of action, because "the duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the [collective-bargaining] contract," and resolution of the dispute would therefore "inevitably . . . involve contract interpretation."  471 U.S. at 217-18.  The Supreme Court noted, however, that "it would be inconsistent with congressional intent under [section 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract."  471 U.S. at 212.

Subsequently, in Caterpillar Inc. v. Williams, the Supreme Court considered whether section 301 permitted employees, who were covered by a collective-bargaining agreement, to bring state-law contract claims for breach of individual contracts between each employee and their employer.  After reiterating that section 301 "governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective bargaining agreement," the Supreme Court concluded that the employees' state claims for breach of their individual employment contracts were not preempted.  482 U.S. at 394 (internal quotation marks omitted).  The Supreme Court reasoned:

> Section 301 says nothing about the content or validity of individual employment contracts.  It is true that respondents, bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under § 301.  As masters of the complaint, however, they chose not to do so.
>
> Moreover, . . . respondents' complaint is not substantially dependent upon interpretation of the collective-bargaining agreement.  It does not rely upon the collective agreement indirectly, nor does it address the relationship between the individual contracts and the collective agreement.

482 U.S. at 394-95.   Accord Voilas v. Gen. Motors Corp., 170 F.3d 367, 373-74 (3d Cir. 1999)(stating that, "under Caterpillar, employees have the option of vindicating their interests by means of either a section 301 action or an action brought under state law, as long as the state-law action as pleaded does not require interpretation of the collective bargaining contract").

### 2.   Determining Whether Claims Are Inextricably Intertwined with Existing Provisions of a Collective-Bargaining Agreement.

"Preemption arises only when an 'evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract.'"   Mowry v. UPS, 415 F.3d 1149, 1152 (10th Cir. 2005)(emphasis in original)(quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. at 213).  "As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."   Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 410 (1988).

In Lingle v. Norge Division of Magic Chef, Inc., the Supreme Court considered whether section 301 completely preempted an employee's state-law retaliatory discharge claim against her employer.   See 486 U.S. at 401.  The Supreme Court's analysis focused first upon the elements necessary to make a prima-facie retaliatory discharge claim under the relevant state law: (i) discharge or a threat of discharge; and (ii) a motive to deter the employee from exercising her rights.   See 486 U.S. at 407.  These elements, the Supreme Court noted, constituted "purely factual

-21-

questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer," neither of which "require[d] a court to interpret any term of a collective-bargaining agreement."  486 U.S. at 407.  Accordingly, the Supreme Court concluded that the employee's state claim was "independent" of the relevant collective-bargaining agreement for purposes of section 301, because "resolution of the state-law claim did not require construing the collective-bargaining agreement."  486 U.S. at 407.  Morever, the Supreme Court found it irrelevant that "the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether [the employee] was fired for just cause [under her collective-bargaining agreement]."  486 U.S. at 408.  "[S]uch parallelism," according to the Supreme Court, would not "render[] the state-law analysis dependent upon the contractual analysis."  486 U.S. at 408.  The Supreme Court opined that the reason for this principle was that

> [Section] 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements.  In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

486 U.S. at 409-10.

In Mowry v. UPS, the Tenth Circuit evaluated each of the plaintiff's claims "to determine whether they [were] 'inextricably intertwined' with existing provisions of his collective-bargaining agreement and, as a result, preempted by § 301 of the LMRA."  415 F.3d at 1152.  The plaintiff's first claim -- retaliatory discharge in violation of public policy -- was based on his allegation that UPS terminated him for refusing to drive when weather and road conditions posed a risk of injury, in violation of statutory regulations stating that commercial drivers must discontinue operation of

vehicles in dangerous conditions.  See 415 F.3d at 1152-53.  The plaintiff argued that, based on the statutory and regulatory provisions, his retaliatory discharge claim was subject to evaluation independent of any interpretation of the collective-bargaining agreement and, as a result, section 301 did not preempt the retaliatory discharge claim.  See 415 F.3d at 1153.  The defendant countered that the claim was preempted, because: (i) each of the statutory and regulatory provisions on which the plaintiff relied were expressly incorporated into the collective-bargaining agreement, and thus resolution of his retaliation claim necessarily would involve an interpretation of the collective-bargaining agreement; and (ii) each element of the retaliation claim required or was substantially dependent on interpretation of the collective-bargaining agreement, and thus the claim and the collective-bargaining agreement were inextricably intertwined.  See 415 F.3d at 1153.  The Tenth Circuit was not persuaded by the defendant's assertion that resolution of the plaintiff's retaliatory discharge claim involved interpretation of the collective-bargaining agreement solely because it expressly incorporated the statutory provisions upon which the plaintiff relied.  See 415 F.3d at 1153.  "To the contrary, it actually makes the [collective-bargaining agreement] dependent on interpretations of federal and state safety regulations."  415 F.3d at 1153.  The Tenth Circuit concluded that the plaintiff's state-law retaliation claim was not preempted solely because the collective-bargaining agreement incorporated the safety regulations upon which he based his claim. See 415 F.3d at 1153.  The Tenth Circuit, nevertheless, found that section 301 of the LMRA preempted the plaintiff's second claim -- that the defendant "shorted his [pay]checks and he was discharged," because he complained about inadequate pay.  415 F.3d at 1157.  The Tenth Circuit explained:

> In order to resolve the claim, a court would have to determine what work [the plaintiff] performed, when he worked, whether delays occurred and, if so, whether he was entitled to be paid for those delays.  The court would also have to determine

> what wages he should have been paid, what wages he actually was paid, whether he was underpaid, and, if so, the amount of the shortfall. All of these issues are regulated by the [collective-bargaining agreement] and, thus, require consideration of the collective bargaining agreement. Article 17 of the [collective-bargaining agreement] expressly assures full payment for all hours worked and specifically addresses rates of pay, computation of time worked, credit for certain delays that occur through no fault of the employee, and procedures for obtaining full payment of wages. In sum, because [the plaintiff's] wage and compensation claim is substantially dependent on analysis of the wage and compensation provisions of the collective bargaining agreement, that claim is preempted by federal labor law.

415 F.3d at 1157. The Tenth Circuit also found that section 301 preempted the plaintiff's third claim -- that the termination constituted intentional infliction of emotional distress. See 415 F.3d at 1157. The Tenth Circuit found that "determining whether [the defendant's] conduct in terminating [the plaintiff] was 'outrageous' requires construction of [the defendant's] rights and obligations under the [collective-bargaining agreement], as that is the reference point against which [the defendant's] action must be scrutinized." 415 F.3d at 1158 (internal citation and quotation omitted).

### 3.   Distinction Between Interpretation of the Collective-Bargaining Agreement and Consultation of the Collective-Bargaining Agreement.

"The Supreme Court has outlined a key distinction between a claim that involves interpretation of [collective-bargaining agreement] terms and one that involves mere reference to those terms, with only the former requiring complete preemption under § 301 of the LMRA." Felix v. Lucent Techs., Inc., 387 F.3d at 1164. "The mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301." Livadas v. Bradshaw, 512 U.S. 107, 124 (1994)(citing Lingle v. Norge Div. of Magic Chef, 486 U.S. at 413 n.2). "Especially when the terms [of the collective-bargaining agreement] are undisputed, the court's limited reference to the collective-bargaining agreement to confirm damages is not sufficient to remove a state law claim on the ground that it is completely preempted by § 301 of the

LMRA." <u>Felix v. Lucent Techs., Inc.</u>, 387 F.3d at 1165.  <u>See</u> <u>Foy v. Pratt & Whitney Group</u>, 127

F.3d 229, 233 (2d Cir. 1997)(emphasizing difference between interpretation of a collective-

bargaining agreement and consultation of a collective-bargaining agreement).

## ANALYSIS

Because there is not a clear and unmistakable agreement to have an arbitrator decide whether

the dispute is arbitrable, the Arbitration Agreement does not provide for an arbitrator to decide

whether the case is arbitrable.  Because Perez' claims do not conflict with, or face complete

preemption under, section 301 of the LMRA, and are otherwise covered under the parties'

Arbitration Agreement, the Court will compel Perez to arbitrate his claims against the Defendants.

Because the parties contractually agreed to an award of costs and attorney's fees if either party

successfully compels arbitration, the Court will award the Defendants their costs and attorney's fees

incurred in bringing this Motion.

## I.    THE FAA GOVERNS THE PARTIES' ARBITRATION AGREEMENT.

The Defendants contend that federal arbitration law or, alternatively, Colorado arbitration

law, governs the arbitration rules the Court must apply based on the contract provisions in the

arbitration agreement.  <u>See</u> Motion at 2.  Parties can generally agree by contract to have a particular

forum's law govern arbitration, absent some conflict with federal arbitration policy:

> In recognition of Congress' principal purpose of ensuring that private
> arbitration agreements are enforced according to their terms, we have held that the
> FAA pre-empts state laws which "require a judicial forum for the resolution of
> claims which the contracting parties agreed to resolve by arbitration."  But it does
> not follow that the FAA prevents the enforcement of agreements to arbitrate under
> different rules than those set forth in the Act itself.  Indeed, such a result would be
> quite inimical to the FAA's primary purpose of ensuring that private agreements to
> arbitrate are enforced according to their terms.  Arbitration under the Act is a matter
> of consent, not coercion, and parties are generally free to structure their arbitration
> agreements as they see fit.  Just as they may limit by contract the issues which they
> will arbitrate, so too may they specify by contract the rules under which that

> arbitration will be conducted.  Where, as here, the parties have agreed to abide by
> state rules of arbitration, enforcing those rules according to the terms of the
> agreement is fully consistent with the goals of the FAA, even if the result is that
> arbitration is stayed where the Act would otherwise permit it to go forward.  By
> permitting the courts to "rigorously enforce" such agreements according to their
> terms, we give effect to the contractual rights and expectations of the parties, without
> doing violence to the policies behind by the FAA.

Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. at 478.  Here, the

parties have agreed by contract that the FAA will apply to arbitration.  The Arbitration Agreement

provides:

> The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA") shall govern the arbitrability
> of all claims, provided that they are enforceable under the Federal Arbitration Act,
> as it may be amended from time to time.  In the event the FAA does not govern, the
> Colorado Uniform Arbitration Act shall apply.  Additionally, the substantive law of
> Colorado, only to the extent it is consistent with the terms stated in this Agreement
> for Arbitration, shall apply to any common law claims.

Arbitration Agreement at 4.  Furthermore, as the Tenth Circuit has acknowledged, the FAA

generally applies to disputes concerning employment relationships:

> Lewis argues that the FAA does not apply to employment relationships or to
> jobs not related to interstate commerce.  But the Supreme Court has determined that
> the FAA applies to agreements to arbitrate employment disputes; indeed, the Court
> specifically has done so with respect to a Circuit City arbitration agreement with a
> sales counselor.  Circuit City Stores, Inc. v. Adams, 532 U.S. 105 . . . (2001).  The
> Court decided that the reference to "transaction" in Section 2 of the FAA is broad
> enough to apply to employment contracts, and held that the exceptions to FAA
> applicability at Section 1 of the Act apply only to employees who work directly in
> a channel of interstate commerce, such as the sea or railroad.  Id. at 118 . . . .  The
> Court so ruled without reference to a test for whether a particular employee's job was
> related to interstate commerce, consistent with its prior holding that Section 2's
> coverage of transactions "involving commerce" is co-extensive with the broad reach
> of the U.S. Constitution's Commerce Clause.  Allied-Bruce Terminix Cos. v.
> Dobson, 513 U.S. 265, 274 . . . (1995).

Lewis v. Circuit City Stores, Inc., 500 F.3d 1140, 1145 n.6 (10th Cir. 2007).  The dispute in this case

arises out of Perez' employment relationship with Qwest.  Thus, the FAA governs the parties'

arbitration agreement.

**II.   THE ARBITRATION AGREEMENT DOES NOT CLEARLY AND UNMISTAKABLY PROVIDE THAT AN ARBITRATOR WILL DECIDE ARBITRABILITY.**

The Defendants argue that, "[u]nder the terms of the Arbitration Agreement, the agreement controls discrimination claims, common law torts and any dispute between these parties regarding 'interpretation of this Attachment.'" Motion at 5.  The Defendants contend that the Arbitration Agreement makes "the question of arbitration itself subject to arbitration," and asserts that, "once this Court determines that a valid agreement to arbitrate exists, the arbitrator is vested with jurisdiction over any questions regarding the satisfaction of conditions precedent and/or enforceability of the arbitration provision."  Motion at 5.

The Supreme Court has held that "courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."  Rent-A-Center, West, Inc. v. Jackson, 130 S.Ct. at 2777 (alterations in original).  In other words:

> In this manner the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because  it is within the scope of a valid arbitration agreement" -- for in respect to this latter question the law reverses the presumption.

First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944.  The language in the agreement that the Defendants contend contains an agreement to arbitrate arbitrability is as follows: "Any claim, controversy or dispute between you and U S WEST, unless otherwise covered by a collective bargaining agreement, whether sounding in contract, statute, tort, fraud, misrepresentation, discrimination or any other legal theory, including, but not limited to, disputes relating to the interpretation of this Attachment . . . ."  Arbitration Agreement at 4 (emphasis added).

To properly decide this issue, it is necessary to evaluate similar arbitration provisions that courts have addressed.  The Tenth Circuit has stated that, "[o]f course, the most 'clear and

unmistakable' agreement to arbitrate the issue of arbitrability would be an express statement to that effect in the parties' contractual agreement to arbitrate disputes arising between them." <u>Dean Witter Reynolds, Inc. v. Howsam</u>, 261 F.3d at 968.  The Tenth Circuit has held that the phrase in an "arbitration clause" that referred to the arbitrator handling "any and all disputes arising out of or relating to the contract" was not clear and unmistakable, because "there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit to an arbitrator the question whether an agreement to arbitrate exists." <u>Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.</u>, 157 F.3d at 780.  The first part of the language in this arbitration clause, "[a]ny claim, controversy or dispute between you and U S WEST," Arbitration Agreement at 4, is similar to the language discussed in <u>Riley Manufacturing Co., Inc. v. Anchor Glass Container Corp</u>. The language in the Arbitration Agreement, however, has more specificity in that it provides that the arbitrator will decide "disputes relating to interpretation of this Attachment," in other words the Arbitration Agreement.  Arbitration Agreement at 4.  The question is whether that additional language is sufficient to evidence a clear and unmistakable agreement to submit the issue of arbitrability to an arbitrator.

The Eighth Circuit found the following language to be clear and unmistakable regarding arbitrability: "Any controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s)." <u>Sadler v. Green Tree Servicing, LLC</u>, 466 F.3d at 624.  That provision is more specific than the one in the Arbitration Agreement here, as it expressly refers to arbitrability.  The Ninth Circuit found the following language to be clear and unmistakable regarding arbitrability:

> If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement <u>or the validity or application of any of the provisions of this Section 4</u>, and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding arbitration.

Momot v. Mastro, 652 F.3d at 988 (emphasis in original).  That underlined provision is somewhat similar to the language appearing in the Arbitration Agreement, which states that the arbitrator will decide "disputes relating to interpretation of this Attachment," in other words the Arbitration Agreement. Arbitration Agreement at 4.  Nevertheless, the agreement in Momot v. Mastro expressly referred to Section 4 of the FAA, which relates to the process of bringing motions to compel arbitration.  See 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . , for an order directing that such arbitration proceed in the manner provided for in such agreement.").

The Second Circuit rejected a party's argument that "a general arbitration clause covering all issues of interpretation would no longer be regarded as sufficiently clear and unmistakable, absent precise language that issues of arbitrability should be arbitrated," stating that it did "not read" the Supreme Court's decision in "First Options so expansively."  Abram Landau Real Estate v. Bevona, 123 F.3d at 73.  In that case, the Second Circuit was interpreting a provision that stated that "[a] Contract Arbitrator shall have the power to decide all differences arising between the parties to this agreement as to interpretation, application or performance of any part of this agreement." Abram Landau Real Estate v. Bevona, 123 F.3d at 73.  That language is similar to the language appearing in the Arbitration Agreement which states that the arbitrator will decide "disputes relating to interpretation of this Attachment," in other words the Arbitration Agreement.  Arbitration Agreement at 4.

Several circuits, however, interpreting provisions similar to the one in this Arbitration Agreement, concluded that there was not a clear and unmistakable agreement to submit the issue of arbitrability to an arbitrator.  The Fourth Circuit has held that "an arbitration clause committ[ing]

all interpretive disputes relating to or arising out of the agreement does not satisfy the clear and unmistakable test." Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d at 102 (alteration in original). The Seventh Circuit concluded that the language requiring arbitration of "all differences arising out of the interpretation or application of any provision of [the] agreement" was not clear and unmistakable. Local 744, Int'l Broth. of Teamsters v. Hinckley & Schmitt, Inc., 76 F.3d at 163-65. In an unpublished opinion, the Sixth Circuit concluded that the following language was not clear and unmistakable: "[T]he arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code which interpretation shall be final and binding upon the parties." Sec. Serv. Network, Inc. v. Cromwell, 1995 WL 456374, at *3.

Thus, circuit courts interpreting similar arbitration provisions to the one in this case appear to have reached different conclusions regarding whether the language is clear and unmistakable regarding the issue of arbitrability. For the Court to decide this issue, it is helpful to go back and consider how the Supreme Court has described the clear-and-unmistakable standard:

> In this manner the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement" -- for in respect to this latter question the law reverses the presumption.

First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 626). Effectively, this rule operates as a tool of construction for arbitration agreements, treating any "silence or ambiguity about the question 'who (primarily) should decide arbitrability'" as support for the conclusion that a court, rather than an arbitrator, will decide arbitrability. First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944. The rationale for these different presumptions is as follows:

-30-

But, this difference in treatment is understandable. The latter question arises when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration. And, given the law's permissive policies in respect to arbitration, one can understand why the law would insist upon clarity before concluding that the parties did not want to arbitrate a related matter. On the other hand, the former question -- the "who (primarily) should decide arbitrability" question -- is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

First Options of Chi., Inc. v. Kaplan, 514 U.S. at 945.

The key word at issue in the Arbitration Agreement, to decide this issue whether the parties agreed to have the arbitrator decide arbitrability, is "interpretation." Arbitration Agreement at 4 (stating that the arbitrator will decide any disputes between the employee and U S WEST, "including, but not limited to, disputes relating to the interpretation of this Attachment"). New Mexico and Colorado courts[3] look to the language of the contract in determining the parties' intent.

_____

[3]Other than on this presumption that arises on the issue whether parties agreed to have an arbitrator decided arbitrability, the Supreme Court has stated that courts "should apply ordinary state-law principles that govern the formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts."). The Defendants argue that Colorado law applies to the interpretation of the Arbitration Agreement, see Reply at 3 n.2, and Perez does not address this issue. As the Court has stated previously: "With respect to conflict-of-law issues involving contracts, New Mexico generally follows the doctrine of lex loci contractus -- the law of the place of contracting controls." Carl Kelley Constr. LLC v. Danco Techs., 656 F.Supp.2d 1323, 1336 (D.N.M. 2009)(Browning, J.)((citing Ferrell v. Allstate Ins. Co., 144 N.M. 405, 421, 188 P.3d 1156, 1172 (2008)). As New Mexico is the forum state for the United States District Court for the District of New Mexico, the Court looks to New Mexico choice-of-law rules to determine which State's substantive law applies. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., No. 10-1020, 2010 WL 5559750, at *6 (D.N.M. Nov. 30, 2010)(Browning, J.). The parties do not provide the Court with any information

See Ad Two, Inc. v. City and Cnty of Denver ex rel. Manager of Aviation, 9 P.3d 373, 376 (Colo.

2000)("The primary goal of contract interpretation is to determine and give effect to the intent of

the parties.  The intent of the parties to a contract is to be determined primarily from the language

of the instrument itself." (citation omitted)); Bogle Farms, Inc. v. Baca, 122 N.M. 422, 428, 925 P.2d

1184, 1190 (1996)("The primary objective in construing a contract is not to label it with specific

definitions or to look at form above substance, but to ascertain and enforce the intent of the parties

as shown by the contents of the instrument.").

The New Oxford American Dictionary defines the term interpretation as "the action of

explaining the meaning of something."  New Oxford American Dictionary 473 (A. Stevenson & C.

Lindberg eds., 3d ed. 2010).  That phrase is notably a general one, as an arbitrator may end up

interpreting many things in an arbitration agreement.  New Mexico and Colorado courts look to the

_____

to determine whether the signing of the Arbitration Agreement occurred.  While the Arbitration
Agreement refers to Colorado arbitration law and the FAA, the Court has determined that the FAA
applies to this arbitration agreement.  The Arbitration Agreement provides a choice-of-law
provision:

> The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA") shall govern the arbitrability
> of all claims, provided that they are enforceable under the Federal Arbitration Act,
> as it may be amended from time to time.  In the event the FAA does not govern, the
> Colorado Uniform Arbitration Act shall apply.  Additionally, the substantive law of
> Colorado, only to the extent it is consistent with the terms stated in this Agreement
> for Arbitration, shall apply to any common law claims.

Arbitration Agreement at 4.  Thus, the agreement provides that Colorado arbitration law applies to
the extent federal arbitration law does not apply.  "Like most states . . . New Mexico has a common
exception to the [lex loci contractus] rule: 'New Mexico respects party autonomy; the law to be
applied to a particular dispute may be chosen by the parties through a contractual choice-of-law
provision.'"  Carl Kelley Constr. LLC v. Danco Techs., 656 F.Supp.2d at 1336 (citing Fiser v. Dell
Computer Corp., 144 N.M. 464, 467, 188 P.3d 1215, 1218 (2008)).  Thus, the parties have agreed
that Colorado arbitration law applies to the extent federal law does not, and Colorado's law
consequently applies to the interpretation of the arbitration agreement to the extent federal law does
not.  Ultimately, however, New Mexico and Colorado law are similar on the contract-interpretation
issues the Court must decide, so the Court will provide citations to authority for each.

contract as a whole to interpret its meaning.  See Newflower Mkt., Inc. v. Cook, 229 P.3d 1058, 1061 (Colo. App. 2010)("Contracts must be construed as a whole, and specific phrases and terms should not be interpreted in isolation."); Campos v. Homes by Joe Boyden, LLC, 140 N.M. 122, 125, 140 P.3d 543, 546 (Ct. App. 2006)("The intention of the parties to a contract is to be determined from the contract as a whole, 'with meaning and significance given to each part in its proper context.'").  For instance, there are various other provisions in the Arbitration Agreement, referred to as Attachment A, including various "pre-employment conditions" an employee must satisfy before receiving a job offer, including provisions: (i) referring to the employee having to take a "drug test"; and (ii) discussing what will fall within the employee background check.  Arbitration Agreement at 3.  The Arbitration Agreement also refers to complying with certain legal requirements, including completing a "Form I-9" and presenting "appropriate documents, as required by the federal government to establish your identity and eligibility to work in the United States."  Arbitration Agreement at 3.  Then, the Arbitration Agreement has a subsection that refers to arbitration, entitled "Agreement for Arbitration."  Arbitration Agreement at 4.  The Arbitration Agreement also includes a lengthy agreement not to disclose trade secrets and other confidential information.  See Arbitration Agreement at 5.  The Arbitration Agreement also has a separate subsection informing the employee that he or she "must agree to follow the U S WEST Code of Business Ethics and Conduct and Corporate Policies and comply with our rules as they are issued or modified from time to time."  Arbitration Agreement at 5.  In light of these various other provisions in the Arbitration Agreement, it is not clear that, when the arbitration clause states that the arbitrator will decide any disputes between the employee and U S WEST, "including, but not limited to, disputes relating to the interpretation of this Attachment," Arbitration Agreement at 4, arbitrability falls within the arbitration clause's scope.  Courts must treat any "silence or ambiguity

-33-

about the question 'who (primarily) should decide arbitrability'" as support for the conclusion that a court, rather than an arbitrator, will decide arbitrability.  First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944.

Furthermore, even within the arbitration clause, there are various provisions that do not bear on the threshold question of arbitrability, which creates an ambiguity about the extent of the arbitrator's authority to interpret the arbitration clause.  The Supreme Court has described the term arbitrability as "whether the parties agreed to arbitrate [a] dispute."  First Options of Chi., Inc. v. Kaplan, 514 U.S. at 942.  Accord AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. at 649 (describing arbitrability as "whether" an "agreement creates a duty for the parties to arbitrate the particular grievance").  The arbitration clause provides the "rules and procedures" which the parties will follow during arbitration, including the number of arbitrators.  See Arbitration Agreement at 4 ("A single arbitrator engaged in the practice of law shall conduct the arbitration under the applicable rules and procedures of the American Arbitration Association ('AAA').").  The arbitration clause refers to how the parties will pick an arbitrator.  See Arbitration Agreement at 4 ("The arbitrator shall be chose from a state other than your state of residence and other than Colorado.").  The arbitration clause specifies the scope of the arbitrator's authority regarding interpretation of the governing law.  See Arbitration Agreement at 4 ("Other than as set forth herein, the arbitrator shall have no authority to add to, detract from, change, amend, or modify existing law.").  The arbitration clause provides for the confidentiality of the arbitration proceedings.  See Arbitration Agreement at 4 ("All arbitration proceedings, including settlements and awards, under this Agreement will be confidential.").  Both New Mexico and Colorado courts follow the principle that a court should construe a contract against the one who drafted it, and the parties do not appear to dispute that U.S. West -- Qwest's predecessor -- drafted the agreement.  See Valdez v. Cantor,

-34-

994 P.2d 483, 486 (Colo. App. 1999)("[I]n the case of any doubt with respect to a contract term, it should be construed most strongly against the drafter."); Smith v. Tinley, 100 N.M. 663, 665 (1984)("In addition, the ambiguities present in the agreement should be construed against Tinley since ambiguities in a contract are to be construed against the party who drafted it."); Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1253 (10th Cir. 2007)("Contra proferentem construes all ambiguities against the drafter.").

Ultimately, the Court cannot say, after considering the terms of the Arbitration Agreement, that is clear and unmistakable that the parties intended to submit questions of arbitrability to the arbitrator. The "silence [and] ambiguity" on this issue in the Arbitration Agreement counsels in favor of this interpretation. First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944. Applying principles of contract construction to the Arbitration Agreement, the more reasoned conclusion is that the parties did not intend to have an arbitrator decide questions of arbitrability. Thus, the Court will decide whether the parties intended to arbitrate this dispute.[4]

## III.   THE COURT WILL COMPEL ARBITRATION.

The parties dispute whether the claims Perez has brought, claims for discrimination under Title VII and an assault-and-battery claim, fall within the scope of the Arbitration Agreement. The relevant portion of the Arbitration Agreement is as follows:

---

[4]None of the parties have requested a Mark V hearing or have identified any extrinsic evidence that would call for a Mark V hearing. According to the Supreme Court of New Mexico in Mark V, Inc. v. Mellekas, 114 N.M. 778, 845 P.2d 1232 (1993), a district court may take extrinsic evidence to determine whether a contract is ambiguous. See 114 N.M. at 781–82, 845 P.3d at 1235-36. There are no indications that, at a Mark V hearing, the Court would obtain any extrinsic evidence that would aid in its interpretation of the Arbitration Agreement. See Abreu v. N.M. Children, Youth and Families Dep't, 797 F.Supp.2d 1199, 1247 n.23 (D.N.M. 2011)(Browning, J.)("Also, the Plaintiffs did not ask for a Mark V hearing or point to any extrinsic evidence it would submit at a Mark V hearing. There is no indication that, at a Mark V hearing, the Court would have anything different to interpret the implied contract that it has now.").

> Any claim, controversy or dispute between you and U S WEST, unless otherwise covered by a collective bargaining agreement, whether sounding in contract, statute, tort, fraud, misrepresentation, discrimination or any other legal theory, including, but not limited to, disputes relating to the interpretation of this Attachment; claims under Title VII of the Civil Rights Act of 1964, as amended; claims under the Civil Rights Act of 1992; claims under the Age Discrimination in Employment Act of 1967, as amended; claims under 42 U.S.C. § 1981, § 1981a, § 1983, § 1985, or § 1988; claims under the Family Medical Leave Act of 1993; claims under the Americans with Disabilities Act of 1990, as amended; and, claims under the Fair Labor Standards Act of 1938, as amended, whenever brought shall be resolved by arbitration.  The only legal claims between you and U S WEST which are not included within this Agreement for Arbitration are claims by you for workers' compensation or unemployment compensation benefits and/or claims for benefits under a U S WEST benefit plan if the plan does not provide for arbitration of such disputes.

Arbitration Agreement at 4.  Perez has argued that his claims are not subject to arbitration, because they are covered by the CBA into which he entered.  He asserts that the claims he has asserted are completely preempted under section 301 of the LMRA such that the CBA has to cover them.

The Supreme Court has held that section 301 of the LMRA completely preempts state-law claims that fall within the scope of a claim under section 301.  See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 23.  "Section 301 of the LMRA governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement, although it does not contain an explicit preemption provision."  Felix v. Lucent Techs., Inc., 387 F.3d at 1163-64 (footnote omitted)(citation omitted)(internal quotation marks omitted).

### A.  PEREZ' TITLE VII CLAIMS ARE SUBJECT TO ARBITRATION.

Regarding Perez' Title VII claims, his argument regarding complete preemption is unpersuasive.  He cites no authority for the proposition that complete preemption applies to other federal causes of action.  In Caterpillar Inc. v. Williams, the Supreme Court articulated the doctrine of complete preemption as follows:

On occasion, the Court has concluded that the pre-emptive force of a statute is so "extraordinary" that it "converts an ordinary <u>state common-law complaint</u> into one stating a federal claim for purposes of the well-pleaded complaint rule." <u>Metropolitan Life Ins. Co.</u>  Once an area of <u>state law has been completely pre-empted</u>, any claim purportedly <u>based on that pre-empted state law is considered, from its inception, a federal claim</u>, and therefore arises under federal law.  <u>See Franchise Tax Bd. [of State of Cal. v. Construction Laborers Vacation Trust for S. Cal.</u>, 463 U.S. 1, 24 (1983)]("If a federal cause of action completely pre-empts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law").

<u>Caterpillar Inc. v. Williams</u>, 482 U.S. at 393 (emphasis added).  Perez cites no authority, and the Court has found none, holding that complete preemption applies to anything beyond state-law causes of action.[5]

Furthermore, his argument runs against a basic tenet of statutory construction that courts must strive to give effect to all of Congress' laws, even if there may be some redundancy, as long as there is no "positive repugnancy" between the two laws.  <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253 (1992)("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both.").  In the context of discrimination statutes, the Supreme Court has stated that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination."  <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 48 (1974).  Regarding Title VII, the Supreme Court has held that "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes."  <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. at 48.  The Supreme Court

_____

[5]Perez has not argued that an arbitration clause in the CBA states that it governs Title VII claims.  In any case, while the Court has portions of the CBA before it, the Court has not located any provisions in the CBA excerpts it has that appear to be arbitration clauses.  Perez has likewise not directed the Court to any such provisions.

has also distinguished between Title VII claims and claims brought under a collective bargaining agreement:

> In reaching the opposite conclusion, the District Court relied in part on the doctrine of election of remedies. That doctrine, which refers to situations where an individual pursues remedies that are legally or factually inconsistent, has no application in the present context. In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums. The resulting scheme is somewhat analogous to the procedure under the National Labor Relations Act, as amended, where disputed transactions may implicate both contractual and statutory rights. Where the statutory right underlying a particular claim may not be abridged by contractual agreement, the Court has recognized that consideration of the claim by the arbitrator as a contractual dispute under the collective-bargaining agreement does not preclude subsequent consideration of the claim by the National Labor Relations Board as an unfair labor practice charge or as a petition for clarification of the union's representation certificate under the Act. There, as here, the relationship between the forums is complementary since consideration of the claim by both forums may promote the policies underlying each. Thus, the rationale behind the election-of-remedies doctrine cannot support the decision below.

Alexander v. Gardner-Denver Co., 415 U.S. at 48 (footnotes omitted)(citations omitted).

Lastly, the Arbitration Agreement covers Title VII claims. The Arbitration Agreement states that an arbitrator must hear "[a]ny claim, controversy or dispute between you and U S WEST . . . but not limited to . . . claims under Title VII of the Civil Rights Act of 1964, as amended." Arbitration Agreement at 4. Thus, the Arbitration Agreement covers his Title VII claims.

**B.   PEREZ' ASSAULT-AND-BATTERY CLAIM IS SUBJECT TO ARBITRATION.**

Perez also contends that the CBA covers his assault-and-battery claim against Maggine. It is worth noting that the Arbitration Agreement defines U.S. West, the party to the Arbitration Agreement, as including "U S WEST, Inc., any successor, subsidiary or affiliate of U S WEST, Inc.,

and the employees, officers, directors, and agents of each of them." Arbitration Agreement at 3. The parties have not disputed that Maggine falls within this definition set out in the Arbitration Agreement. The parties have not disputed that the claims Perez has asserted against Maggine would be subject to arbitration unless the CBA covers them.[6]

### 1.     Relevant Facts Regarding the Assault-and-Battery Claim.

"In 2010, Perez suffered an injury to his back while on a Qwest duty assignment." Complaint ¶ 22, at 4. "The injury resulted in a ruptured disk in Perez' lower back." Complaint ¶ 22, at 4. "When Maggine learned of Perez' injury, he called Perez and angrily stated that he was considering terminating Perez." Complaint ¶ 22, at 4. "Maggine continued to harass and intimidate Perez. Maggine threatened Perez by shutting a laptop computer in Perez' face." Complaint ¶ 27, at 5. "Maggine also physically threatened Perez by leaning into him forcefully in the workplace." Complaint ¶ 27, at 5. "Shortly afterwards, on May 27, 2011, Maggine drove his company vehicle towards Perez at a Las Cruces gas station." Complaint ¶ 28, at 5. "Maggine drove the vehicle directly at Perez and swerved at the last moment, barely avoiding hitting Perez." Complaint ¶ 28, at 5. "Maggine confronted Perez at the gas station and screamed at Perez." Complaint ¶ 28, at 5. "Perez, afraid for his safety, then called Qwest corporate security and reported the assault Maggine inflicted on Perez." Complaint ¶ 28, at 5.

---

[6]Enforcing arbitration agreements against non-signatories is generally not permitted. See Thompson v. THI of N.M. at Casa Arena, No. 05-1331, 2008 WL 5999653, at *14 (Dec. 24, 2008)(Browning, J.)(recognizing that "[a] non-signatory to an arbitration agreement generally cannot be forced to arbitrate claims" subject to certain exceptions, such as when a "non-signatory has a principal/agent relationship or is the alter-ego of the signatory"). Given that no one has disputed that Perez signed the Arbitration Agreement, there is no dispute that he is a signatory to the Arbitration Agreement. Additionally, Maggine, who has the same counsel represent him as Qwest, has not disputed that arbitration is appropriate, even though he does not appear to have signed the Arbitration Agreement before the Court.

"On May 31, 2011, Maggine . . . approached Perez while Perez was seated at a work computer." Complaint ¶ 30, at 5. "Maggine forcefully leaned into Perez, handed Perez papers that Maggine told Perez to sign, and then left." Complaint ¶ 30, at 5. "The papers represented an unjustified disciplinary action Maggine had written up." Complaint ¶ 30, at 5. "When Maggine exited Perez' proximity, Perez, again fearful for his safety, left the area and went to his truck." Complaint ¶ 30, at 5. "Maggine followed Perez and began chasing Perez as Perez entered the truck. Maggine was shouting at Perez and pulling at the door of the truck." Complaint ¶ 30, at 5. "Perez rightly feared that Maggine was beside himself and feared that Maggine would attack him." Complaint ¶ 30, at 5. "Maggine banged on the windows of the vehicle and repeatedly attempted to forcefully enter the truck." Complaint ¶ 30, at 5. "Perez told Maggine to get away from the vehicle but Maggine refused. Perez then called the police to report the situation." Complaint ¶ 31, at 5. "The police came and the situation was eventually defused." Complaint ¶ 31, at 5-6. "Qwest management then demanded that Perez hand in his work badge and truck keys and ordered him off the property." Complaint ¶ 31, at 6. Perez eventually "began to suffer from heart palpitations, depression, and anxiety," as well as "panic attacks." Complaint ¶ 36, at 7.

Article 12 of the CBA provides that "[a]n employee whose Term of Employment (TOE) is one (1) or more years shall receive wage replacement during the first seven (7) consecutive calendar days of absence due to sickness" according to a formula table specified in the CBA. CBA at 8. Article 16.3 of the CBA provides: "Neither the Company or its representative, nor the Union, its local representative or members, will attempt, by means other than the grievance procedure, to bring about the settlement of any issue which is properly a subject for disposition through grievance or arbitration procedures." CBA at 11. The relevant provisions of article 23 of the CBA are as follows:

An employee who is unable to perform the functions determined as essential by the Company of his or her regular job as a result of an on-the-job accidental injury (as defined in the West Disability Plan) or an illness, physical or mental limitation, or off-the-job injury, will be considered for a position of equal or lower status and pay.

. . . .

. . . If Qwest Disability Services or its designee has determined the employee can return to work with a medical restriction of one hundred eighty (180) calendar days or less, the employees shall remain in the present job title and receive the present paid rate for up to ninety (90) calendar days.  If after ninety (90) calendar days the employee is still unable to perform the essential functions of his or her regular job, the employee shall remain in the present job title and the remaining ninety (90) calendar days shall be treated as non-paid excused time.   A maximum of one hundred eighty (180) calendar days (paid/unpaid) will be allowed in a rolling twelve (12) month period regardless of the number or nature of the employee's restrictions.

The Company or Union Bargaining Agents may initiate a review based on extenuating circumstances, to discuss any exceptions of the (180) calendar days prior to placement of an employee on an eighty (80) day job search as outlined in Section 23.6.   Any such agreement between the parties' Bargaining Agents shall be considered non-precedential and non-referable.

CBA at 13.  The remaining relevant portions of article 23 are as follows:

To assist in determining the abilities of an employee with medical restrictions, an assessment may be conducted at the request of the employee or the local union (if the employee concurs) or at the initiation of the Company.  The employee must participate in this evaluation.  The assessment tool, which may include but not be limited to, a Functional Capacity Evaluation, Independent Medical Evaluation, and/or Cognitive Testing, will be determined by Qwest Disability Services or its designee based on the employee's condition and diagnosis.  This assessment will determine the employee's ability to remain in his/her current job or another job within the Company with or without accommodation.  Utilization of the assessment tool will not alter the job search process as outlined in Article 23.6

. . . .

. . . Following is the position to be taken regarding the option of obtaining an Independent Medical Evaluation (IME).  A demotion or termination handled under the provisions of Article 16 which results from the imposition of a medical restriction, shall not be subject to arbitration.  If a dispute arises concerning either the length or the scope of the medical restriction, and the employee so requests or the local union requests (if the employee concurs), Qwest Disability Services or its designee will consult with the employee's personal physician concerning the length

-41-

and scope of the restriction.  If they are unable to agree, the matter will be referred to a mutually acceptable physician (in accordance with the administrative guidelines in place regarding this process) who is knowledgeable in occupational safety and health matters who shall be afforded the opportunity to review the pertinent medical data, to review the requirements of the work place, and to examine the employee. An agreement with the independent physician will ensure that the results of the examinations will be received by the Company and the Union within fifteen (15) calendar days of the examination.  Both the Company and the Union will comply with the decision of this physician as to the proper length and scope of the restriction.

CBA at 13.

### 2. Section 301 of the LMRA Does Not Completely Preempt Perez' Assault-and-Battery Claim.

Section 301 of the LMRA provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  The Tenth Circuit has explained that section 301 "preempts questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort."  Cisneros v. ABC Rail Corp., 217 F.3d at 1302 (citations omitted)(internal quotation marks omitted).  "Preemption arises only when an 'evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract.'" Mowry v. UPS, 415 F.3d at 1152 (emphasis in original).  "As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."  Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. at 410.

In Allis-Chalmers Corp. v. Lueck, the Supreme Court set forth the standard for determining when section 301 completely preempts a state law claim: "[W]hen resolution of a state-law claim

is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law."  471 U.S. at 220 (citation omitted).  In <u>Allis-Chalmers Corp. v. Lueck</u>, the plaintiff brought a state tort claim against his employer for the bad-faith processing of an insurance claim.  <u>See</u> 471 U.S. at 206.  The Supreme Court concluded that section 301 completely preempted the cause of action, because "the duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the [collective-bargaining] contract," and resolution of the dispute would therefore "inevitably . . . involve contract interpretation."  471 U.S. at 217-18.  The Supreme Court noted, however, that "it would be inconsistent with congressional intent under [section 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract."  471 U.S. at 212.

The Arbitration Agreement provides that Colorado law governs common-law causes of action brought against Qwest.  <u>See</u> Arbitration Agreement at 4 ("Additionally, the substantive law of Colorado, only to the extent it is consistent with the terms stated in this Agreement for Arbitration, shall apply to any common law claims.").  Quoting from the <u>Restatement (Second) of Torts</u> (1965), the Supreme Court of Colorado has provided the following definition for a battery cause of action:

(1)    An actor is subject to liability to another for battery if

(a)    he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b)    an offensive [or harmful] contact with the person of the other directly or indirectly results.

(2)    An act which is not done with the intention stated in Subsection (1, a) does not make the actor liable to the other for a mere offensive contact with the

> other's person although the act involves an unreasonable risk of inflicting it
> and, therefore, would be negligent or reckless if the risk threatened bodily
> harm.

White v. Muniz, 999 P.2d 814, 816 (Colo. 2000)(alteration in original)(emphasis omitted).  The

elements for an assault cause of action under Colorado law are as follows:

> To establish assault, the following elements must be proved:  (1) the
> defendant acted either with the intent of making a contact with the person of the
> plaintiff or with the intent of putting the plaintiff in apprehension of such a contact;
> (2) the plaintiff was placed in apprehension of an imminent contact with his or her
> person by the conduct of the defendant; and (3) such contact was or appeared to be
> harmful or offensive.

Adams v. Corr. Corp. of Am., 187 P.3d 1190, 1198 (Colo. App. 2008).  As the Colorado Court of

Appeals has stated: "The elements of battery are similar [to those of assault], except that the contact

must have actually resulted."  Adams v. Corr. Corp. of Am., 187 P.3d at 1198.

The elements for a battery cause of action and an assault cause of action would not require

Perez to address, to prove his claims, "questions relating to what the parties to a labor agreement

agreed, and what legal consequences were intended to flow from breaches of that agreement."

Cisneros v. ABC Rail Corp., 217 F.3d at 1302.  The basic events that Perez alleges occurred,

viewing the Complaint in the light most favorably to Perez, that would constitute potentially tortious

conduct under these causes of action include the following: (i) "Maggine threatened Perez by

shutting a laptop computer in Perez' face," Complaint ¶ 27, at 5; (ii) "Maggine . . . physically

threatened Perez by leaning into him forcefully in the workplace," id. ¶ 27, at 5; (iii) "Maggine

drove [his] vehicle directly at Perez and swerved at the last moment, barely avoiding hitting Perez,"

id. ¶ 28, at 5; (iv) "Maggine confronted Perez at the gas station and screamed at Perez," id. ¶ 28, at

5; (v) "Maggine forcefully leaned into Perez, handed Perez papers that Maggine told Perez to sign,

and then left," id. ¶ 30, at 5; (vi)  "Maggine followed Perez and began chasing Perez as Perez

entered the truck. Maggine was shouting at Perez and pulling at the door of the truck," id. ¶ 30, at 5; and (vii)  "Maggine banged on the windows of the vehicle and repeatedly attempted to forcefully enter the truck," id. ¶ 30, at 5.  It is not necessary for a court to conduct any interpretation of the CBA to determine whether Maggine battered or assaulted Perez on those occasions.  See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. at 410 ("As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes.").   "Preemption arises only when an 'evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract.'" Mowry v. UPS, 415 F.3d at 1152 (emphasis in original).   There are no facts indicating that a battery or assault claim would be inextricably intertwined with the consideration of the terms of the CBA.

Perez contends that he has certain "rights, obligations, and privileges afforded through the CBA."  Response at 4.  He directs the Court to article 16.3 of the CBA, which provides: "Neither the Company or its representative, nor the Union, its local representative or members, will attempt, by means other than the grievance procedure, to bring about the settlement of any issue which is properly a subject for disposition through grievance or arbitration procedures."  CBA at 11.  Perez has directed the Court to no provision of the CBA that addresses physical altercations between employees such that a court might have to consult the CBA to resolve such a claim.  Furthermore, people face common-law liability for assaulting and battering one another, independent of any collective bargaining provision to that effect.  The Supreme Court has held that "it would be inconsistent with congressional intent under [section 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract."  Allis-Chalmers Corp. v. Lueck, 471 U.S. at 212.  Perez has also not pled that the CBA has any provisions that relate to

-45-

assault and battery, and he is the master of his complaint.   As the Supreme Court has stated in a similar context:

> Section 301 says nothing about the content or validity of individual employment contracts.   It is true that respondents, bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under § 301.  As masters of the complaint, however, they chose not to do so.
>
> Moreover, . . . respondents' complaint is not substantially dependent upon interpretation of the collective-bargaining agreement.   It does not rely upon the collective agreement indirectly, nor does it address the relationship between the individual contracts and the collective agreement.

Caterpillar Inc. v. Williams, 482 U.S. at 394-95.

Perez contends that "[t]he CBA further contains a number of provisions related to injured/ill employees."  Response at 4-5.  Once again, it is not necessary for a court to consult any of those provisions, which the Court has set out in detail above, to determine whether an assault or battery occurred.  See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. at 410 ("As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes.").  "Preemption arises only when an 'evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract.'"  Mowry v. UPS, 415 F.3d at 1152 (emphasis in original).  Those provisions primarily relate to employee leave from work when they are sick or injured, or become sick or injured through an accident.  They do not discuss injuries that other employee's inflict upon another.  Furthermore, people face common-law liability for assaulting and battering one another, independent of any collective bargaining provision to that effect.  The Supreme Court has held that "it would be inconsistent with congressional intent under [section 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract."  471 U.S. at 212.  Perez has also not pled

-46-

that the CBA has any provisions that relate to assault and battery, and he is the master of his complaint.   Even if those provisions somehow affect Perez' damages for assault and battery, and it is not clear that they would, "[t]he mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301."   Livadas v. Bradshaw, 512 U.S. at 124.   "Especially when the [collective-bargaining agreement's] terms are undisputed," and no one has argued that the CBA's terms are disputed in this case, "the court's limited reference to the collective-bargaining agreement to confirm damages is not sufficient to remove a state law claim on the ground that it is completely preempted by § 301 of the LMRA." Felix v. Lucent Techs., Inc., 387 F.3d at 1165.   Thus, Perez' argument that section 301 preempts his assault-and-battery claim is unpersuasive.

Lastly, the Arbitration Agreement covers assault-and-battery claims.   The Arbitration Agreement states that an arbitrator must hear "[a]ny claim, controversy or dispute between you and U S WEST . . . whether sounding in contract, statute, tort, fraud, misrepresentation, discrimination, or any other legal theory."   Arbitration Agreement at 4.   Colorado law recognizes tort causes of action for assault and battery.   See White v. Muniz, 999 P.2d at 816; Adams v. Corr. Corp. of Am., 187 P.3d at 1198.   Thus, the Arbitration Agreement covers Perez' assault-and-battery claim. Consequently, because the Arbitration Agreement covers all Perez' claims against the Defendants, the Court will compel Perez to arbitrate his claims.

## IV.   THE COURT WILL ORDER PEREZ TO PAY THE DEFENDANTS' COSTS AND EXPENSES INCURRED IN BRINGING THE MOTION TO COMPEL.

The Arbitration Agreement provides:

If any party hereto files a judicial or administrative action asserting claims subject to this arbitration provision, and another party successfully stays such action and/or compels arbitration of such claims, the party filing said action shall pay the other

party's costs and expenses incurred in seeking such stay and/or compelling arbitration, including reasonable attorney's fees.

Arbitration Agreement at 4. Under Colorado law, "[a]ttorney fees generally are not recoverable by the prevailing party in a contract or tort action," although "the parties may alter this rule by agreement." <u>Bedard v. Martin</u>, 100 P.3d 584, 593 (Colo. App. 2004). <u>Accord</u> <u>Garcia v. Jeantette</u>, 134 N.M. 776, 780, 82 P.3d 947, 951 (Ct. App. 2003)("Generally, a party may recover attorney fees only when authorized by statute, court rule, or an agreement expressly providing for their recovery."). "Fee-shifting provisions replace the otherwise applicable rule that the losing party does not have to pay the winner's attorney fees." <u>Bedard v. Martin</u>, 100 P.3d at 593. <u>Accord</u> <u>Credit Inst. v. Veterinary Nutrition Corp.</u>, 133 N.M. 248, 256, 62 P.3d 339, 347 (Ct. App. 2002)("As a general rule, litigants are responsible for their own attorney fees absent statutory authority or some other authority such as a contract allowing such fees.").

There is no dispute that Perez signed the Arbitration Agreement. <u>See</u> Arbitration Agreement at 6. He has not argued that the agreement is invalid, and the Court has compelled arbitration. He asks the Court not to award fees, because doing so would be inequitable. He largely relies on the fact that no one knew about the arbitration clause until after he filed the case. Nothing in the Arbitration Agreement provides for an exception to an award of costs and fees on equitable grounds. Parties can agree to modify by contract the general rule that they do not bear each others costs and attorney's fees, and Qwest and Perez have done so here. Accordingly, the Court will award the Defendants their costs and fees. The Court is not persuaded that the award is inequitable. When Perez learned of the arbitration provision, he did not agree to arbitration, but forced Qwest to file a motion to compel to present the matter to the Court. The Defendants should prepare an affidavit and schedule detailing the costs they have incurred, including their attorney's fees. They should first

consult with Perez to see if he is amenable to paying the fees without the Court's involvement.  If the parties cannot reach a resolution, the Defendants can file these documents with the Court, and Perez can articulate why he finds a particular portion of the costs to be objectionable.

Lastly, Perez has requested his costs and fees in responding to the Motion seeking to compel arbitration on the basis that it "should not have been brought."  Response at 7.  He cites no authority or provision in the Arbitration Agreement to support the proposition that he is entitled to fees if he successfully defends against the Motion.  More importantly, the Court has granted the Motion.  Thus, the Court will deny Perez' request for costs and fees.

## V.   THE COURT WILL NOT DELAY COMPELLING ARBITRATION UNTIL PEREZ FILES A MOTION SEEKING LEAVE TO AMEND.

Perez relates that, to assert LMRA claims, he would need to amend his pleadings to assert such claims against Qwest and his union.  See Response at 5-6.  He notes that he "is now in the process of finalizing an amended complaint which will include claims against the CWA for breach of a duty of fair representation."  Response at 5-6.  He notes that, "[a]t that point, this action will become a hybrid § 301 action under the Labor Management Relations Act."  Response at 6.  He relates that "these circumstances are not fatal to Perez's recovery on his discrimination and common law claims against Defendants and, furthermore, have no bearing on the issue of arbitrability before the Court."  Response at 6.

Perez has not provided the Court with a proposed pleading outlining what his amended claims would be.  And Perez is not correct that he will need to amend his complaint to state a claim against Qwest, because the Court has already concluded, without passing on the merits of the particular claims Perez has asserted, that section 301 does not affect Perez' rights under Title VII or under his common law claim for assault and battery.  The case has been pending now for over

nine months, with Perez filing his Complaint on September 23, 2011.  The case needs to move

forward.  Furthermore, as the Defendants have pointed out, Perez may not be able to bring claims

under section 301 if his claims are time-barred under the six-month statute of limitations applicable

to section 301 claims, see DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 154-55 (1983)

(concluded that the six-month statute of limitations prescribed in 29 U.S.C. § 160(b) applies to

claims brought under section 301 of the LMRA), or if he has not exhausted the appropriate

procedures to bring those claims, see Republic Steel Corp. v. Maddox, 379 U.S. 650, 652

(1965)(concluded that the "general rule" under "federal labor policy [that] requires that individual

employees wishing to assert contract grievances must attempt use of the contract grievance

procedure agreed upon by employer and union" applies to section 301 claims).  It appears that the

Court should send at least the present claims to arbitration.  The Court has also provided guidance

on the law, perhaps enlightening the parties on any further disputes.  If there are federal claims for

which Court needs to address arbitrability, the Court can do that task when the issue comes before

it without delaying the case further.  In light of all these concerns, and the procedural posture of this

case, the Court concludes that the more reasoned course of action is to compel arbitration now rather

than later.

      **IT IS ORDERED** that the Defendants' Petition to Compel Arbitration and Award

Attorneys' Fees or to Dismiss Jury Demand and Demand for Punitive Damages, filed January 31,

2012 (Doc. 18), is granted.  The Court will compel Plaintiff Leonardo Perez to litigate his claims

against Defendants Qwest Corporation and Rick Maggine.

_____
UNITED STATES DISTRICT JUDGE

-50-

*Counsel:*

Michael E. Mozes
Mozes Law Office
Albuquerque, New Mexico

> *Attorney for the Plaintiff*

Eric R. Burris
Adam E. Lyons
Brownstein Hyatt Farber Schreck, LLP
Albuquerque, New Mexico

> *Attorneys for the Defendants*